Dr. Allen FRIEDMAN, Michael J. Nellis, individually and on behalf of all others similarly situated, Plaintiffs,

Paul R. Peavey, and Wendy Repovich, Plaintiff–Intervenors,

v.

DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., d/b/a Dollar Rent a Car; Dollar Rent a Car, Inc.; and DTG Operations, Inc. d/b/a/ Dollar Rent a Car, Defendants.

Civil Action No. 12–cv–02432–WYD–KMT

United States District Court, D. Colorado.

Signed January 5, 2017

Alan McQuarrie Mansfield, Whatley Kallas, LLC–San Diego, San Diego, CA, John Caspar Mattes, III, John Caspar Mattes, III, Attorney at Law, San Diego, CA, S. Scott Garrett, Whatley Kallas, LLC–Birmingham, Birmingham, AL, Joe Ramon Whatley, Jr., Whatley Kallas, LLP–Aspen, Aspen, CO, for Plaintiffs.

Jessica Lynn Fuller, Michael D. Plachy, Lewis Roca Rothgerber Christie LLP–Denver, Denver, CO, Anna S. McLean, David Edward Snyder, Peter Scott Hecker, Sheppard Mullin Richter & Hampton, LLP–San Francisco, San Francisco, CA, Brian H. Rowe, Daniel Justin Weiss, Jill Marie Hutchison, John F. Ward, Jr., Ross B. Bricker, Jenner & Block, LLP–Chicago, Chicago, IL, for Defendants.

## ORDER ON SUMMARY JUDGMENT

Wiley Y. Daniel, Senior United States District Judge

### I. INTRODUCTION

THIS MATTER is before the Court on cross motions for summary judgment. Plaintiffs' Motion for Summary Judgment, filed on March 25, 2016, seeks judgment as to Count I of the Fifth Amended Complaint for violations of the Colorado Consumer Protection Act ["CCPA"] on behalf of Plaintiff Dr. Allen Friedman ["Friedman"] and Plaintiff-Intervenors Paul R. Peavey ["Peavey"] and Wendy Repovoch ["Repovich"] [collectively "Plaintiffs"]. Since the motion does not seek judgment as to all claims or on behalf of Plaintiff Michael J. Nellis ["Nellis"], I note that it is actually a motion for partial summary judgment. The motion is fully briefed.

Defendants' Motion for Summary Judgment, also filed on March 25, 2016, seeks summary judgment as to all Plaintiffs and all claims. It is fully briefed as well.

The case arises out of an alleged scheme by Defendants [hereinafter "Dollar"] to trick consumers, including Plaintiffs, into buying insurance and other services they did not want, including collision or loss damage waiver ["CDW"] or ["LDW"] car insurance. (Fifth Am. Compl. and Jury Demand, ECF No. 229, ¶ 12.) Plaintiffs allege they were charged for these services without proper consent or contrary to specific disclosure requirements, and/or that they were misled into signing up for such services contrary to their initial agreements. (*Id.*)

The Fifth Amended Complaint asserts only individual claims by Plaintiffs, and was filed after lengthy proceedings as to class certification that ultimately resulted in the denial of such certification. It asserts claims for violations of the CCPA on behalf of Friedman, Peavey, and Repovich (Count I) as well as for violations of the Florida Deceptive and Unfair Trade Practices Act ["FDUTPA"] on behalf of Nellis (Count II). It also asserts claims for breach of contract and breach of the covenant of good faith and fair dealing (Count III), declaratory relief as to the parties' respective rights, duties, and obligations under various agreements (Count IV), and unjust enrichment (Count V).

For the reasons stated below, Dollar's Motion for Summary Judgment is granted as to all claims. Plaintiff's Motion for Summary Judgment is denied.

### II. FACTS

I note at the outset that I have considered all the facts and evidence cited by the parties, as well as the responses and replies as to these facts, but have cited only those facts I deem most material to my ruling. Exhibits submitted by Dollar are referenced by letter, *e.g.*, Exhibit A. Exhibits submitted by Plaintiffs are referenced by number, *e.g.*, Exhibit 1. Since both motions attach exhibits with the same numbers and letters, for clarity I have cited to the docket numbers that the exhibits are attached to.[1] I have cited to the record only when the facts were disputed

---

1. Plaintiffs' exhibits to its motion are attached to the Declaration of S. Scott Garrett, ECF No. 266.

or where I otherwise thought it was necessary.

Dollar is a car rental company that, along with car rentals, offers customers optional products, including different types of insurance coverages and damage waivers. During the relevant period, Dollar's rental process was centered around the in-person counter transaction. Although Dollar accepted online reservations, most reservations did not require any form of payment or credit card and could be cancelled or changed at will by customers without any charge.

When a customer arrived at Dollar's rental counter, Dollar's representatives would ask questions to determine whether the customer might be interested in purchasing any optional product for their rental. One optional product that a customer could choose to purchase was LDW. LDW is an agreement with the customer (a contractual waiver) that relieves the customer of financial responsibility for unintentional damage to the rental car.

Pursuant to Colo. Rev. Stat. § 6-1-203, a rental agreement containing a provision for LDW must include a written disclosure as follows:

NOTICE: THIS CONTRACT OFFERS, FOR AN ADDITIONAL CHARGE, A COLLISION DAMAGE WAIVER TO COVER YOUR RESPONSIBILITY FOR DAMAGE TO THE VEHICLE. YOU ARE ADVISED NOT TO SIGN THIS WAIVER IF YOU HAVE RENTAL VEHICLE COLLISION COVERAGE PROVIDED BY CERTAIN GOLD OR PLATINUM CREDIT CARDS OR COLLISION INSURANCE ON YOUR OWN VEHICLE. BEFORE DECIDING WHETHER TO PURCHASE THE COLLISION DAMAGE WAIVER, YOU MAY WISH TO DETERMINE WHETHER YOUR OWN VEHICLE INSURANCE AFFORDS YOU COVERAGE FOR DAMAGE TO THE RENTAL VEHICLE AND THE AMOUNT OF THE DEDUCTIBLE UNDER YOUR OWN INSURANCE COVERAGE. THE PURCHASE OF THIS COLLISION DAMAGE WAIVER IS NOT MANDATORY AND MAY BE WAIVED.

According to Plaintiffs, prior to January 2013 Dollar provided no signage, literature, placemat, or any other information that contained the written disclosures required by § 6-1-203. (ECF No. 266, Ex. 8, Catanzarite Dep. 113:3–114:5; 141:3–143:6.) Plaintiffs also assert that Dollar does not provide the rental jacket, the long strip receipt or other documentation that contains the required disclosure language until after the customer has signed to complete the transaction. (*Id.* 141:3–143:6.)

Dollar denies the foregoing assertions. It asserts that Plaintiffs have not cited any testimony stating that Dollar did not provide any signage, literature, placemat, or other information containing the required disclosures. Dollar's representative testified that he *could not recall* whether signs were posted, the dates when placemats were used, or whether the placemats included the disclosure language. (ECF No. 266, Ex. 8, Catanzarite Dep. 113:3–114:5; 141:3–143:6.) Dollar also asserts that the disclosure language in § 6-1-203 was provided to customers in "a variety of different ways". (ECF No. 272, Ex. G, Catanzarite Dep. 140:17–144:21; Ex. C, Capsanes Decl. ¶ 38; ECF No. 266, Ex. 11, Repovich Rental Agreement; ECF No. 275, Ex. O, Rental Jacket.)

Thus, Dollar asserts that it provided the disclosure language on an electronic screen, called a SigCap console, before a customer was asked to provide their signature as to the rental. (ECF No. 266, Ex. 9, Catanzarite Decl. ¶ 25.) Dollar states that it used the SigCap console to review with

each customer the optional products and the price for each. (ECF No. 272, Ex. C, Capsanes Decl. ¶¶ 22–37.) If a customer elected to purchase LDW or another optional product, the SigCap screen displayed that selection and the price the customer would pay for the product. (*Id.* ¶ 31.) Each customer was asked to click "Agree" if they agreed with the charge. (*Id.* ¶¶ 39–45.)

It is undisputed, however, that Dollar did not include the disclosure language found in § 6–1–203 in the SigCap console until January 17, 2013. Indeed, Plaintiffs note that Dollar's own manager in charge of DIA admitted that the mandatory disclosure language was added to the series of SigCap screens after this lawsuit was filed. (ECF No. 266, Ex. 8, Catanzarite Dep. 113:3–114:5; Ex. 9, Catanzarite Decl. ¶ 25). Plaintiffs also deny Dollar's assertion that "each customer was asked to click 'Agree' if they agreed with the charge". (*See, e.g.,* ECF No. 266, Ex. 7, Repovich Dep. 32:5–10 ("Were you being shown any screens at that point? Not that I recall, no."))

Prior to January 2013, Dollar asserts it is undisputed that the disclosure language required in § 6–1–203 was provided in the printed rental agreement and the rental jacket given to the customer. (ECF No 272, Ex. G, Catanzarite Dep. 140:17–141:2; Ex. C, Capsanes Decl. ¶ 38; ECF No. 266, Ex. 11, Repovich Rental Agreement ECF No. 275, Ex. O, Rental Jacket.) Thus, at the end of the rental process at the counter, Dollar asserts that it printed each customer a hard copy rental agreement containing the key terms of the rental and a summary of the charges. (*Id.*) For customers who selected LDW, Dollar contends that the rental agreement clearly set out the charge for "Loss Damage Waiver" under the header "Optional Coverages." (*See, e.g.,* ECF No. 266, Ex. 11.) Plaintiffs admit in part and deny in part these allegations. They assert that the Dollar RSA may have printed customers a hard copy document, but the RSA then folded it up and put it in a rental jacket without first showing it to customers. (*See* ECF No. 266, Exs. 4–6.) Plaintiffs also dispute whether the hard copy "*clearly* set[s] out the charge for 'Loss Damage Waiver' under the header 'Optional Coverages'" when it is provided after the transaction is completed. (*See, e.g.,* Ex. 11.)

It is undisputed that Dollar RSAs at the Denver airport also often asked customers, including Repovich, to initial the LDW charges on the hard copy of the rental agreement before leaving the rental counter. If a customer asked that an optional product be removed from a rental contract, Dollar's policy was to remove such charges, even after the customer provided a signature. Similarly, a contract was not considered closed, and charges could still be altered or reversed, even after the customer left with the vehicle.

Turning to the Plaintiffs, Friedman rented a car from Dollar at DIA on November 20, 2011. He made his reservation using Southwest.com. Friedman understood he was free to cancel his reservation, modify its terms, or fail to pick up his rental without incurring any charges or penalty. Friedman knew that LDW was not mandatory and could duplicate coverage provided by insurance or a credit card. Friedman printed out the statement of charges from the reservation for the rental in September 2011, prior to his visit to DIA. The Rental Car Itinerary states that the estimated car cost is $227.13. (ECF No. 266, Ex. 3.)

According to Plaintiffs, Friedman saw no signs at the Dollar rental counter concerning LDW, nor was Friedman provided any literature. (ECF No. 266, Ex. 2, Friedman Dep. 41:21–42:25.) Defendants deny this, noting that Friedman testified that he

could not *recall* any signs at the rental counter. (*Id.*) Friedman testified that the Dollar rental sales agent ["RSA"] provided him with a hard copy, triplicate form that he thought included information related to LDW, but he did not read the form. (ECF No. 272, Ex. A, Friedman Dep. 45:–47:5, 51:10–53:10.)

Plaintiffs assert that the Dollar RSA with whom Friedman dealt did not disclose the annual or daily cost of the LDW, that the purchase of LDW was not mandatory, or that LDW may be duplicative of other coverage Friedman already had. (ECF No. 266, Ex. 2, Friedman Dep. 43:16–45:8, 48:1–4; 143:20–145:6.) Dollar denies this, stating that Friedman cannot recall what the RSA orally said to him. (*Id.* 48:18–49:11, 50:13–22, 51:23–25.) It asserts that the RSA provided Friedman with at least one document that disclosed the daily cost of the LDW. (ECF No. 267, Ex. 1, Friedman Rental Agreement; ECF No. 272, Ex. A, Friedman Dep. 53:15–54:4; Ex. B, Mierendorf Decl. ¶ 2; Ex. C, Capsanes Decl. ¶ 38.) Further, Dollar contends that the RSA provided Friedman with at least two documents that disclosed the purchase of LDW was not mandatory and that LDW may be duplicative of other coverage that he already had. (ECF No. 266, Ex. 39; ECF No. 272, Ex. A, Friedman Dep. 53:15–55:18, 67; Ex. B, Mierendorf Decl.; Ex. C, Capsanes Decl. ¶ 38; ECF No. 275, Ex. O, Rental Jacket; Ex. N, Friedman Rental; ECF No. 267, Ex. 1, Friedman Rental Agreement.)

Friedman signed the rental agreement where the RSA indicated he should and then was handed a rental jacket with a long strip of paper folded up inside. Friedman was charged $215.91 for LDW at the rate of approximately $23.99 per day.

Dollar admits that Friedman was not asked to sign, nor did he sign, any electronic pad authorizing charges for LDW as the entire transaction was on paper. Plain-tiffs also assert that the agent did not review the charges on the long strip print out with him prior to putting the slip in the jacket. (ECF No. 266, Ex. 2, Friedman Dep. 54:19–57:11.) Dollar denies this, noting that Friedman testified the RSA presented him with a written document and asked him to initial two to four areas of the document and to sign it. The RSA pointed him to areas that he was asked to initial, and Friedman initialed those areas without reading them. (ECF No. 272, Ex. A, Friedman Dep. 50:8–54:18, 63:3–65:4.)

It is undisputed that the Dollar RSA at the rental counter presented Friedman with a written rental agreement, but Friedman did not read it because he "do[esn't] read things like that." (ECF No. 272, Ex. A, Friedman Dep. 51:15–19.) Friedman testified that the timing of the § 6-1-203 disclosure had no effect on his transaction with Dollar. (*Id.* 68:8–10—"Q. If you had seen this language before you signed your rental agreement, would you have done anything differently? A. I would not have.")

Friedman received a complete refund of the amount he was charged for LDW within 90 days of incurring the disputed charges, in the form of a credit on his credit card. He received a refund for "all that [he] claimed" and has never asked Dollar for more money back than what he was refunded. Friedman testified that he is not seeking any financial compensation through this suit.

As to Peavey, Plaintiffs assert that he made an online reservation through www.dollar.com to rent a car from Dollar on August 10, 2013, and accepted the offered rate of $194.18 to rent the vehicle for three days. (ECF No. 266, Ex. 5, Peavey Decl. ¶ 2; Ex. 4, Peavey Dep. 19:17–24; 22:24–23:13; 26:8–23.) Dollar clarifies as to that rate that the reservation e-mail indicates a "Base Rate" of $140.40, lists certain other

charges, and includes an "Estimated Grand Total" of $194.18. (ECF No. 266, Ex. 10.)

Dollar admits that a reservation was made in Peavey's name to rent a car from Dollar. It asserts, however, that Peavey's wife made the reservation; thus, Dollar states that Peavey did not accept anything during the reservation process. (ECF No. 272, Ex. D, Peavey Dep. 55:20–21, 104:3–5.) Peavey did not understand the reservation to involve any financial commitment and understood that rental car reservations may be cancelled without incurring a penalty.

Peavey's reservation was for a rental car beginning on August 16, 2013, and the rental was to last three days plus three extra hours. (ECF No. 266, Ex. 10, Peavey Reservation E-mail.) Peavey went to the Dollar location at DIA to pick up a car on August 16, 2013. At the time of his rental, Peavey knew that LDW was not mandatory and could duplicate coverage under insurance or a credit card.

According to Plaintiffs, Peavey did not see any signs at the Dollar location, received no pamphlet containing the required disclosures, and saw no placemat that would have put him on notice that the LDW coverage offered by Dollar was optional and might duplicate his already existing automobile insurance or LDW coverage provided by his credit card. (ECF No. 266, Ex. 5, Peavey Decl. ¶ 3; Ex. 4, Peavey Dep. 42:15–43:18; 47:15–23.) Plaintiffs further assert that Peavey was not provided written disclosure about the possibility of duplicative coverage while he was at the rental counter. (*Id.*, Ex. 5, Peavey Decl. ¶ 5; Ex. 4, Peavey Dep. 49:3–13; 42:8–43:21.)

Dollar admits in part and denies in part the facts in the previous paragraph. It first notes that Peavey testified only that he did not *recall* seeing language that LDW coverage was optional or that it might dupli-

cate his already-existing automobile insurance or coverage provided by his credit card. (ECF No. 266, Ex. 4, Peavey Dep. 42:2–21.) Dollar then asserts that Peavey was provided with a written disclosure that LDW was optional and potentially duplicative of other coverage in at least three ways. First, Dollar asserts that Peavey was presented with the terms of his rental agreement on a screen on the SigCap console, which included the required disclosure language and the cost for LDW that he was accepting before he provided a signature. (ECF No. 272, Ex. F, Carey Decl. ¶ 6 and Ex. A; Ex. C, Capsanes Decl. ¶¶ 22–37.)

Dollar asserts that the first SigCap screen Peavey was presented with stated:

NOTICE: THIS CONTRACT OFFERS, FOR AN ADDITIONAL CHARGE, A COLLISION DAMAGE WAIVER TO COVER YOUR RESPONSIBILITY FOR DAMAGE TO THE VEHICLE. YOU ARE ADVISED NOT TO SIGN THIS WAIVER IF YOU HAVE RENTAL VEHICLE COLLISION COVERAGE PROVIDED BY CERTAIN GOLD OR PLATINUM CREDIT CARDS OR COLLISION INSURANCE ON YOUR OWN VEHICLE. BEFORE DECIDING WHETHER TO PURCHASE THE COLLISION DAMAGE WAIVER, YOU MAY WISH TO DETERMINE WHETHER YOUR OWN VEHICLE INSURANCE AFFORDS YOU COVERAGE FOR DAMAGE TO THE RENTAL VEHICLE AND THE AMOUNT OF THE DEDUCTIBLE UNDER YOUR OWN INSURANCE COVERAGE. THE PURCHASE OF THIS COLLISION DAMAGE WAIVER IS NOT MANDATORY AND MAY BE WAIVED.

(Ex. F, Carey Decl. ¶ 6 and Ex. A, Peavey SigCap Screens.) According to Dollar,

Peavey accepted LDW at a total charge of $107.96 by clicking "Agree" on the second SigCap screen, which stated:

OPTIONS SELECTION:

LOSS DAMAGE WAIVER—4DYS@26.99 = $107.96

TOTAL OPTIONAL CHARGES ACCEPTED = $107.96

(*Id.*)

Plaintiffs deny that Peavey was presented with the terms of his rental agreement on the SigCap pad, and cite Peavey's testimony that he did not see this language on the SigCap screen when he rented the automobile from Dollar. (ECF No. 274, Ex. 14, Peavey Dep. 42:8–43:17.) Peavey testified that the RSA did not point him to the language contained on the SigCap screen at the Dollar counter, nor to the daily and total cost of the LDW, and that, had he seen those charges, he would have "challenged it." (*Id.* 42:8–43:17, 46:18–49:13, 50:10–24.)

After Peavey signed his name on the final SigCap screen and before the transaction was completed, Dollar also asserts that Peavey was provided with a hard copy of the rental agreement that contained the language in § 6–1–203. (ECF No. 266, Ex. 10, Peavey Rental Agreement; ECF No. 272, Ex. D, Peavey Dep. 33:5–16, 34:13–23, 82:12–86:5; Ex. C, Capsanes Decl. ¶ 38.) He was also provided the rental jacket with the same information. (ECF No. 272, Ex. F, Carey Decl. ¶ 6 and Ex. A; Ex. D, Peavey Dep. 32:20–34:9, 82:12–85:5; Ex. C, Capsanes Decl. ¶ 38; Ex. G, Catanzarite Dep. 171:7–20—describing printing a hard copy and having customers initial the charges; ECF No. 266, Ex. 10; Ex. 4, Peavey Dep. 33:5–16, 34:13–23; ECF No. 275; Ex. O.)

In response to the foregoing paragraph, Plaintiffs admit that there is an electronic version of Peavey's signature on the rental agreement. They assert, however, that Peavey was not presented with any rental car receipt, contract or agreement until after he had initialed where the Dollar RSA indicated and the transaction had been completed. (ECF No. 266, Ex. 5, Peavey Decl. ¶ 5; Ex. 4, Peavey Dep. 33:17–35:3.)

When Peavey reviewed the charges to his credit card, Plaintiffs assert that he discovered he had been charged $107.96 for LDW that he had expressly declined at the rental counter. (ECF No. 266, Ex. 5, Peavey Decl. ¶ 5; Ex. 4, Peavey Dep. 38:10–19; 87:19–89:17; Ex. 10.) Dollar admits that Peavey was charged $107.96 for LDW, but again denies that Peavey declined to purchase LDW at the rental counter. It reiterates that Peavey indicated an intention to purchase LDW by clicking "Agree" on the SigCap screen that stated he accepted charges of $107.96 for LDW, by signing his name after reviewing LDW disclosures on the SigCap, and by separately initialing LDW charges on the hard copy of his rental agreement.

Dollar further asserts that Peavey separately initialed his rental agreement to reflect "the charges that [he] had accepted" but did not read what he was initialing. (ECF No. 272, Ex. D, Peavey Dep. 33:5–16.) Peavey took the initialed copy of the rental agreement. (*Id.* 34:13–17, 118:14–22.) Plaintiffs admit that Peavey signed where the RSA indicated he should but deny Dollar's remaining assertions. Peavey testified that his "expectation was that it reflected all the charges that I had accepted *and the charges that I had rejected*, and we moved on." (*Id.* 33:8–16.) Dollar also cites to Peavey's testimony that he "probably read about a sentence into it and noticed that it pertained to a damage waiver," and "wouldn't have read the rest of it." (*Id.* 46:18–47:9.)

After Peavey discovered he had been charged $107.96 for LDW that he had allegedly expressly declined at the rental

counter, he (or his wife on behalf of Peavey) called and wrote a letter to Dollar demanding the return of the LDW charges. (ECF No. 266, Ex. 5, Peavey Decl. ¶ 5; Ex. 4, Peavey Dep. 66:20–67:18; 68:12–69:6; ECF No. 272, Ex. D, Peavey Dep. 70:14–71:23.) Peavey has received no credit or a refund from Dollar for $122.27, nor has he received a credit from his credit card company.

Plaintiff Repovich made an online car reservation from Dollar through American Automobile Association ["AAA"] from December 28, 2012 through January 4, 2013. When making her rental reservation on the AAA website, Repovich saw a disclosure advising her that LDW is optional, that details of LDW are available at the rental counter, and that the cost of LDW ranges from $26.99 to $36.99 per day depending on the vehicle type. Plaintiffs assert that AAA is a partner of Dollar, which Dollar disputes. Repovich understood she could cancel her reservation or enter into a new agreement with Dollar when she arrived to pick up her vehicle.

Plaintiffs assert that Dollar quoted Repovich the amount of $203.45 as the price of her car rental, and that she received no message advising her to review her existing automobile insurance or credit card coverage to determine if the LDW coverage offered by Dollar might be duplicative of coverage she already had. (ECF No. 266, Ex. 6, Repovich Decl. ¶ 2; Ex. 7, Repovich Dep. 102:2–103:17.) Dollar denies this, asserting that it does not operate the AAA website on which Repovich allegedly received a "quote" and does not control the information that third parties display on their websites. (ECF No. 272, Ex. H, Coniglio Dep. 20:1–10, 36:21–37:4.) Dollar further asserts that customers are not routed through nor directed to dollar.com during their reservation process on third-party sites like AAA. (Id., Ex. M, Coniglio Decl. ¶ 10.) Repovich does not recollect the

amount quoted and has no documentation of her AAA reservation or any amount "quoted" therein. (Id., Ex. I, Repovich Dep. 101:6–103:17.) The AAA site included advisements that LDW was optional, that customers may already have insurance coverage covering rental vehicles, and that customers should review their current automobile insurance policy. (Id. 104:6–105:18; Exs. J and K.)

When Repovich arrived at the DIA Dollar location on December 28, 2012, Plaintiffs assert that she did not see any signs in the Dollar location or language on any placemat, nor was she provided literature advising her that the LDW coverage offered by Dollar might be duplicative of the coverage she already had. (ECF No. 266, Ex. 6, Repovich Decl. ¶ 4; Ex. 7, Repovich Dep. 27:21–29:1; 32:5–20.) Dollar admits this in part and denies it in part, noting that Repovich testified she did not *recall* seeing any signs or placemats at the DIA Dollar location on December 28, 2013.

Plaintiffs also contend that while Repovich was at the rental counter at DIA, she was neither offered nor provided any document, such as a rental car agreement, receipt, or other document, until after she had clicked the electronic screen or signed the electronic signature pad. (ECF No. 266, Ex. 6, Repovich Decl. ¶ 4; Ex. 7, Repovich Dep. 33:9–35:3; 38:4–39:14.) Dollar denies this, stating that Repovich was provided with disclosures and terms of her rental agreement on the SigCap console as she was clicking the electronic screen and before she signed the SigCap console. Further, Dollar notes Repovich's testimony that the RSA provided her with a paper document that was printed after she arrived at the counter that looked like a "typical contract," including the cost per day and options. She testified that she initialed several places on that paper document without reading them. She further

testified, according to Dollar, that the RSA told her that the paper document was "the contract" and showed her where to sign, and she signed it. (ECF No. 272, Ex. L, Repovich SigCap Screens; Ex. F, Carey Decl. ¶ 7; Ex. I, Repovich Dep. 33:22–36:21.)

Thus, Dollar asserts it provided Repovich with disclosures related to LDW in the rental agreement and the rental jacket, both of which advised that LDW might duplicate existing coverage. (ECF No. 266, Ex. 7, Repovich Dep. 33:22–35:3; Ex. 11, Repovich Rental Agreement; ECF No. 272, Ex. I, Repovich Dep. 36:7–21, 38:4–39:8; Ex. C, Capsanes Decl. ¶ 38; ECF No. 275, Ex. O, Rental Jacket.) Repovich was asked specifically to initial the LDW charges in the printed rental agreement which contained the § 6–1–203 disclosure. (ECF No. 266, Ex. 11, Repovich Rental Agreement; ECF No. 272, Ex. I, Repovich Dep. 33:22–35:3, 36:7–21, 38:4–39:1; Ex. C, Capsanes Decl. ¶ 38.) The rental jacket also, according to Dollar, contained the § 6–1–203 disclosure language. (ECF No. 266, Ex. C, Capsanes Decl. ¶ 38; ECF No. 275, Ex. O.)

Repovich understood at the time of her rental that LDW was not mandatory and may duplicate coverage that she may have from her own insurance or a credit card. Repovich executed a rental agreement with Dollar, and that agreement contained express terms for the purchase of LDW and the § 6–1–203 disclosure language. Plaintiffs admit that Repovich initialed the rental agreement next to the stated charges for LDW, but deny that she agreed to LDW. Instead, they assert that Repovich understood that she was initialing where the Dollar RSA indicated she should to "say no, that I didn't want" such coverage. (ECF No. 266, Ex. 6, Repovich Dep. 34:2–35:3.)

It is undisputed that Repovich did not read what she was initialing at that time,

and that she took the signed rental agreement and rental jacket. At no point in time did Repovich read the rental agreement or the rental jacket. Repovich testified that the timing of Dollar's statutory disclosure concerning LDW had no effect on her transaction with Dollar because she was "assuming she was not receiving [LDW]."

After Repovich returned her rental car on January 4, 2013, she discovered she had been charged $119.95 for LDW. She has not received a credit or a refund for this.

Finally, Nellis made a reservation on dollar.com on or about July 27, 2012, to rent a car at Dollar's Fort Myers, Florida, location on July 29, 2012. Nellis understood that he could cancel or change his online reservation without any fee or penalty, and he executed a rental agreement with Dollar at its Fort Myers location.

Dollar asserts that Nellis's rental agreement contained an express charge for LDW. (ECF No. 267, Ex. I, Nellis Dep. 38:4–8; Exs. D & E, Nellis Rental Agreements.) In addition, Dollar contends that it displayed the LDW charge on the SigCap screen shown to Nellis. (Id., Ex. M, Mierendorf Decl. ¶ 5 and Ex. D.) Plaintiffs dispute this, pointing to Nellis's testimony that he did not recall seeing a "SigCap" console screen, nor did he recall "clicking" anything on a screen at the Dollar location. (ECF No. 271, Ex. 4, Nellis Dep. 36:19–25; 45:25–46:17.)

Dollar also contends that Nellis admitted that Dollar's representative circled and highlighted his rental agreement where the LDW charges were indicated. (ECF No. 267, Ex. I, Nellis Dep. 39:11–13, 41:3–43:7.) Plaintiffs deny this. They assert that Nellis did not testify that he signed the agreement "where the LDW charges were indicated," but merely signed where the rental sales agent told him to and that he believed he was initialing "that [he had] a copy of the receipt." (Id. 42:12–19.)

It is undisputed that at the request of Dollar's RSA, Nellis separately initialed the highlighted LDW charge on the printout of his rental agreement. He was charged for LDW by Dollar in the total amount of $231.92. It is also undisputed that Nellis testified that Dollar's disclosures did not influence him in any way—he already "kn[e]w that information", and that Dollar's LDW disclosures "would have been a useless warning to [him]." (ECF No. 267, Ex. I, Nellis Dep. 48:15–49:13; 103:19–104:5.)

## III. ANALYSIS

### A. Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of showing that no genuine issue of material fact exists is borne by the moving party. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead bring forward "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The court must view the evidence in the light most favorable to the nonmoving party. *Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 590 (10th Cir. 1999). All doubts must be resolved in favor of the existence of triable issues of fact.

*Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

When the parties file cross motions for summary judgment, the court is " 'entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.' " *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). Cross motions for summary judgment must be treated separately—the denial of one does not require the grant of another. *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

### B. The Merits of the Motions

#### 1. Friedman's Claims

■ Dollar asserts that because Friedman received a full refund of the disputed LDW charges, he has no damage, injury or standing as to any of the claims, each of which requires a showing of "damage" or "injury." Thus, it argues that Friedman can not establish an injury in fact, as required for Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs argue in response that Friedman has standing despite the refund because he was not paid prejudgment interest on the amount contested as required by Colo. Rev. Stat. § 5–12–103. Thus, they claim that it remains possible for the Court to grant relief to Friedman, citing *Campbell–Ewald Co. v. Gomez*, —— U.S. ——, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016).

The Supreme Court in *Gomez* held that " 'an actual controversy . . . be extant at all stages of review. . . .' " 136 S.Ct. at 669. It found that " '[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.' " *Id.* (quotation omitted). The *Gomez* court did not address the issue at

hand, however, regarding whether a person who has been paid in full as to the amount allegedly wrongfully withheld has standing where he was not paid interest on the amount.

Plaintiffs have not cited any authority for their argument that such a person would have standing. In contrast, Dollar has cited a number of cases which hold that standing would not exist in such situation, and I find these cases controlling. *See Hayes v. Wal–Mart Stores Inc.*, No. 10–460 (JBS/KMW), 2014 WL 654542, at *6, *9 (D.N.J. Feb. 20, 2014) (granting summary judgment on consumer protection, contract, and unjust enrichment claims where defendant offered full refund of service plan's purchase price); *Stanford v. Home Depot USA, Inc.*, No. 07cv2193–LAB, 2008 WL 7348181, at *5–9 (S.D. Cal. May 27, 2008) (applying Rule 56 standards and dismissing contract, implied warranty of good faith and fair dealing, and consumer protection claims for lack of standing where plaintiff received full refund of overcharged amount before filing suit); *US West, Inc. v. Business Discount Plan, Inc.*, 196 F.R.D. 576 (D. Colo. 2000) (granting summary judgment where the plaintiff "no longer [had] injuries compensable under the CCPA" because the defendant "re-rated" plaintiff's their telephone service to provide a refund); *see also Becker v. Skype Inc.*, No. 5:12–CV–06477–EJD, 2014 WL 556697, at *2–3 (N.D. Cal. Feb. 10, 2014) (a *de minimus* interest award is insufficient to confer Article III standing where a plaintiff has received a complete refund for the principal amount sought). This is consistent with what I previously noted in the context of class certification that Friedman's refund "negat[ed] any claimed injury." (ECF No. 160, January 27, 2015 Order on Motion for Class Certification, at 20.)

In further support of my finding that Friedman does not have standing based merely on Dollar's failure to pay him interest on his claim, I note that Friedman has presented no evidence that he actually paid the disputed charge in the short period of time between the time the charge posted to Friedman's credit card and the time the charge was reversed, or that the charge had any monetary effect upon him. Friedman also admitted that he has received "all that [he] claimed," has never asked Dollar for more than what he was credited, and is not seeking any financial compensation in the suit. (ECF No. 267, Ex. F, Friedman Dep. 91:3–92;14; ECF No. 275, Ex. X, Friedman Dep. 112:4–16.)

Based on the foregoing, I find that summary judgment must be granted in favor of Dollar on all claims asserted by Friedman. Plaintiffs' Motion for Summary Judgment is denied as to Friedman. I now turn to the remaining Plaintiffs.

### 2. The Statutory Claims Under the CCPA and FDUTPA

Plaintiffs Friedman, Peavey, and Repovich assert that they are entitled to summary judgment as to the CCPA claims. They argue it is undisputed that Dollar did not provide mandated written disclosures prior to selling them LDW and therefore engaged in an unfair or deceptive practice under the CCPA. Indeed, they assert that Dollar's failure to provide the mandated disclosures prior to entering into the rental car transactions with Plaintiffs is a *per se* violation of Colo. Rev. Stat. § 6–1–202. Since I have already granted summary judgment in favor of Dollar and against Friedman, this means that only Peavey's and Repovich's CCPA claims remain.

Defendants assert that summary judgment is appropriate both as to the CCPA claims and the FDUTPA claim asserted by Nellis because there is no "causal nexus" between a specific alleged practice and any alleged injury as required for Plaintiffs'

statutory claims. That is because Dollar contends that the undisputed facts show that it provided each Plaintiff with an explicit disclosure of the LDW charge, the Plaintiffs admit that they did not read it, and admit that the timing or form of Dollar's statutory disclosures concerning LDW has nothing to do with their complaints.

Turning to the relevant provision of the CCPA, Colo. Rev. Stat. § 6–1–202 prohibits the sale "to any lessee renting a motor vehicle in this state" of "a collision damage waiver as part of the rental contract unless the lessor first gives the lessee written disclosure, as provided in section 6–1–203, of the terms and provisions of such waiver." Section 6–1–203(2) requires that the required disclosure language (previously set forth in Section II) be "prominently displayed" by Dollar. and also states that "[t]he failure by a lessor to comply with any provision of this section is a deceptive trade practice under the provisions of this article." (emphasis added).

Plaintiffs argue in response to Dollar's motion that there is a per se violation of the CCPA, asserting that § 6–1–202 "obviates the need for Plaintiffs to establish causation" (Pls.' Opp. to Defs.' Mot. Summ. J. at 2.) Plaintiffs cite to the ruling in my Order of July 1, 2015, regarding Dollar's motion for reconsideration as to class certification. In that Order I rejected an argument by Dollar that Plaintiffs' allegations were inconsistent with CCPA causation which requires a plaintiff to establish an injury-in-fact that was caused by a deceptive trade practice listed in the statute. I found that "[t]he material act that gives rise to a claim is the failure to make the disclosure", and that "[i]njury occurs when Dollar collects money for LDW from a customer despite having not made the appropriate disclosure." (ECF No. 222, Order on Def.'s Mot. for Reconsideration, at 16.)

I find, however, that this case is in a different posture now then when that Order was entered, in that I am reviewing the evidence presented on summary judgment. Moreover, I find after more careful analysis of the case law that Plaintiffs cannot merely rely on a per se violation of the statute for causation; instead, they must show an actual injury. Indeed, the CCPA itself states that a plaintiff must establish an "injur[y] as a result of [an alleged] deceptive practice. Colo. Rev. Stat. § 6–1–113(c); *see also Rhino Linings, USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003) (plaintiff must show that he or she suffered an injury in fact to a legally protected interest).

The Colorado Supreme Court has further established that "the CCPA requires a plaintiff to establish a causal nexus between an allegedly deceptive practice and the consumer harm. *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92, 96 (Colo. 2011); *see also HealthOne v. UnitedHealth Group Inc.*, 805 F.Supp.2d 1115, 1120 (D. Colo. 2011) (the plaintiff must establish that "the challenged practice *caused* the plaintiff's injury") (emphasis added). I agree with Defendants that courts in Colorado have held that no such causal nexus may be demonstrated when the defendant has expressly disclosed the matter the plaintiff complains of, but the plaintiff failed to read the defendant's disclosure, as in this case. *See Miller v. McCloud*, No. 14–cv–1156–WJM–KLM, 2016 WL 524357, at *7 (D. Colo. Feb. 10, 2016) (granting summary judgment on fraud and CCPA claims alleging that an appraisal failed to disclose information where the appraisal contained an explicit disclaimer that it did not address that subject, and holding that "the only type of person who could be deceived by the appraisal or have their confidence violated or be injured by it is someone who did not read the entire ap-

praisal"); *Nguyen v. Am. Mut. Ins. Co.*, No. 15–cv–0639–WJM–KLM, 2015 WL 5867266, *8 (D. Colo. Oct. 8, 2015) (dismissing a CCPA claim where the plaintiffs "fail[ed] to allege that they actually read the summary disclosures when considering whether to buy or keep their policies", as the plaintiffs could not say that the alleged deception in the disclosures "caused their respective injuries"); *Weitz Co., LLC v. Mid–Century Ins. Co.*, 181 P.3d 309, 315 (Colo. App. 2007) (affirming summary judgment on CCPA claim where contract expressly disclosed terms).

Here, it is undisputed that the statutory disclosures about LDW had no effect on either Peavey's or Repovich's transactions with Dollar. Indeed, Peavey admitted that such disclosures had no effect on his transaction with Dollar because he would not read such a disclosure, and that he did not read the rental agreement or what he was initialing in the agreement as he "took it for granted that what was being stated [by the RSA] was true"). (ECF No. 271, Garrett Decl., Ex. 2, Peavy Dep. 33:13–16.) Moreover, while Peavey "denied ever having seen a 'SigCap' console" that contained the disclosure, he admitted it was possible that he signed one electronically and admitted it was his electronic signature on Dollar's record of his transaction. (ECF No. 267, Ex. G, Peavey Dep. at 32:20–33:4, 42:6–11, 49:16; ECF No. 272, Ex. D., Peavey Dep. 50:1–24.) Repovich also admitted that the timing of the statutory disclosure concerning LDW had no effect on her transaction with Dollar, and that she did not read what she was initiating or the agreement she was given. Based on the foregoing, I find that Plaintiffs have failed to establish causation and injury as required to state a claim under the CCPA.

As to Plaintiffs' argument that they can establish a per se violation, obviating the need for causation, I find persuasive Judge Krieger's analysis rejecting a similar "per se" argument regarding the CCPA. *See Frias v. Chris the Crazy Trader, Inc.*, No. 13–cv–1240–MSK, KLM, 2014 WL 2975321, at *2 (D. Colo. July 1, 2014). She noted in *Frias* that "no Colorado court has recognized a difference in the elements of a CCPA claim asserting a deceptive trade practice" under different parts of the CCPA. She then found that "in light of Colorado's precedent ... there is no indication that Colorado intends to make such a distinction." *Id.* I agree, and reject Plaintiffs' per se argument. Indeed, as Judge Krieger held, § 6–1–105(1)(x) incorporates other parts of the CCPA into the more general definition of a violation, making clear that a plaintiff must establish *all* "elements necessary to prove a CCPA claim brought under § 6–1–113." *Id.* at *2. The same analysis applies here, as § 6–1–105(x) likewise incorporates § 6–1–203. Accordingly, I find that Dollar's Motion for Summary Judgment must be granted as to the CCPA claims. Plaintiffs' Motion for Summary Judgment on these claims is denied.

■ I also grant Dollar's summary judgment motion as to the FDUTPA claim by Nellis. Similar to Colorado law regarding the CCPA, a FDUTPA claim under Florida law "must allege that the deceptive act or unfair practice *actually caused* plaintiff's claimed damages." *Dolphin, LLC v. WCI Communities, Inc.*, No. 07–80241–CIV, 2008 WL 6894512, at *5 (S.D. Fla. Feb. 20, 2008) (emphasis added). Here, Nellis testified that Dollar's disclosures did not influence him in any way—he already "kn[e]w that information", and that Dollar's LDW disclosures "would have been a useless warning to [him]." (ECF No. 267, Ex. I, Nellis Dep. 48:15–49:13; 103:19–104:5.) Accordingly, I find that he cannot show that the alleged deceptive act or unfair practice of Dollar actually caused his injuries. *See also Silver v. Countrywide*

*Home Loans, Inc.*, 760 F.Supp.2d 1330, 1340 (S.D. Fla. 2011) (where a plaintiff complains of alleged misrepresentations that were "contradicted by the very terms of the agreement she signed," a FDUTPA claim fails because, "as matter of law, [plaintiff] is deemed to have knowledge of documents she voluntarily signed").

#### 4. Plaintiffs' Claim for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing

 I also find that summary judgment should be granted in favor of Dollar and against Plaintiffs as to this claim. I agree with Dollar that no Plaintiff has come forward with any contract other than the one signed by them at the rental counter containing an express term for LDW. It is Plaintiffs' burden to establish evidence that some other contract was formed—including a "manifestation of mutual assent to particular contract terms" and consideration. *Rapucci v. High Sierra Energy, LP*, No. 14–cv–00977–RBJ, 2014 WL 5423282, at *2 (D. Colo. Oct. 24, 2014). Plaintiffs have adduced no such evidence. While Plaintiffs argue that their website reservations were a contract, each conceded that the online reservation process did not create a binding commitment of any kind—each Plaintiff could change, cancel, or simply not show up for a reservation without any charge or penalty. (ECF No. 272, Ex. F, Friedman Dep. 29:18–30:20; Ex. G, Peavey Dep. 25:23–26:7; Ex. H, Repovich Dep. 23:6–22; Ex. I, Nellis Dep. 22:6–23:1.)[2] "If one party in fact promises nothing, there is no mutuality

and no contract." *United Press Int'l, Inc. v. Sentinel Pub. Co.*, 166 Colo. 47, 441 P.2d 316, 319 (1968).

Moreover, the written rental agreement could not have been breached because each rental agreement contained an express term for a charge for LDW. (ECF No. 272, Exs. A–E.) There is no evidence that Dollar did not perform the rental agreement as written. The fact that Plaintiffs may not have wanted to purchase LDW does not mean that the contract was breached.

 Plaintiffs' good faith and fair dealing theory likewise fails because it requires evidence of a "specific contract term" that permits "discretion" in the way it is performed. *Rapucci*, 2014 WL 5423282, at *2. Plaintiffs have adduced no evidence of such a term or how Dollar purportedly breached it.

Indeed, I have twice before rejected Plaintiffs' assertion of a breach of contract. In my Order of September 27, 2013, on Dollar's motion to dismiss, I found that Plaintiffs failed to allege a breach of the written rental agreement. (ECF No. 72 at 16.) Plaintiffs alleged various misrepresentations that occurred before the making of the written rental agreement, and I found that such allegations "do not constitute a breach of the contract." (*Id.*) Plaintiffs then realleged this count without repairing the underlying faulty premise, and Dollar moved to strike it. (*See* ECF No. 212 at 14.) I granted that motion by Order of July 1, 2015, finding that "the inclusion in the Fourth Amended Complaint of claims that

**2.** Further, by their own terms, Plaintiffs' reservations do not establish a fixed price for a car rental or preclude the addition of optional products accepted at the rental counter. Each reservation provided only an "estimate" of charges and advised that additional fees or charges could apply, including if a customer selected optional products. (*E.g.*, ECF No. 275, Ex. N at PLTFS–CO–000005–07, Fried-

man Reservation E–Mail; Ex. Y, Peavey Reservation E–Mail; ECF No. 272, Ex. F, Friedman Dep. 32:22–33:25.) Peavey and Nellis were advised on dollar.com that LDW would be available at the counter and that "[y]ou can change your rental options at any time, online or at the counter." (ECF No. 275, Ex. Z; *see also* Ex. V, AAA Policy Details as to Repovich.)

have previously been dismissed is improper, and that these claims should be stricken." (ECF No. 222 at 17.) Plaintiffs then realleged the same claim in their Fifth Amended Complaint, and again I find no evidence to support the claim.

5. Plaintiffs' Unjust Enrichment Claim

 I also grant summary judgment in favor of Dollar and against Plaintiffs as to the unjust enrichment claim. There is no dispute that each Plaintiff's rental car transaction was governed by a written agreement. (Exs. A—Friedman; B—Peavey; C—Repovich; D & E—Nellis.) "[A] party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Investments, LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).

6. Plaintiffs' Declaratory
Judgment Claim

Finally, in Count IV, Plaintiffs alleged a claim for declaratory judgment that incorporates all of the factual allegations from their other claims and requests a "judicial determination and declaration of rights." (ECF No. 229, Compl. at ¶¶ 69–72.) It alleges no independent facts or claim. I agree with Defendants that because summary judgment is appropriate with respect to all other claims, it is also appropriate with respect to the declaratory judgment count that is dependent on the other claims. Dollar's summary judgment motion is thus also granted as to this claim.

IV. CONCLUSION

In conclusion, it is

ORDERED that Defendants' Motion for Summary Judgment (ECF No. 267) is **GRANTED** as to all claims asserted by Plaintiffs. Plaintiff's Motion for Summary

Judgment (ECF No. 265) is **DENIED**. In light of this ruling, it is

ORDERED that Defendants' Rule 702 Motion to Exclude the Testimony of Donald R. Lichtenstein and James S. Tennant (ECF No. 259) is **DENIED AS MOOT**. Finally, it is

ORDERED that the three-day jury trial set to commence on Monday, March 13, 2017, and the Final Trial Preparation Conference set on Wednesday, March 1, 2017, at 4:00 p.m. are **VACATED**.